IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal No. 08-CR-18 |
| v. : | |
| : | (Chief Judge Kane) |
| ANTHONY JOHNSON, : | |
| : | |
| Defendant : | |

## MEMORANDUM

On January 7, 2007, Harrisburg police officers performed a traffic stop of a taxicab in which Anthony Johnson was a passenger. Based on evidence uncovered during the stop, Johnson was indicted by a federal grand jury in the Middle District of Pennsylvania with illegal possession of a firearm and illegal possession of controlled substances. On, April 23, 2008, Johnson filed a motion to suppress, seeking exclusion of "the stop, continued detention, the arrest, and any evidence seized as the result of the stop, continued search and seizure due to violations of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution." (Doc. No. 23.) Johnson additionally seeks to suppress his "subsequent statements provided to law enforcement officers as the fruits of the poisonous tree of the illegal seizure and search." (Id.) For the following reasons, the Court will deny Johnson's motion.

I.    BACKGROUND

At about 9:30 p.m. on the night of January 7, 2007, the Harrisburg Police Department received an emergency 911 call from Tammy Anderson. Ms. Anderson explained that she was calling to report a gunshot and fighting incident in a nearby parking lot. She said she was calling from her the front porch of her house on the 2500 block of Seventh Street at its intersection with Radnor Street. Anderson explained that she saw a taxicab pull into the parking lot diagonally across the intersection and park next to a van. She then heard a gunshot and saw two people

wrestling on the ground near the vehicles. While she was on the phone with the 911 operator, the cab pulled out of the lot and left. The van remained parked in the lot. (911 Call Tr. 2–3.)[1]

Although she acknowledged that her visibility was limited by poor eyesight, darkness, and rain, Anderson was nevertheless able to give a description of the cab. It was white with a green light on its roof, and she thought that she saw some kind of tan side-paneling on it. Ms. Anderson indicated that the cab was distinct because of its unusual green light: "[a]ctually the cab did not even look like it's from here. A white cab . . . [i]t had a green light on the top of it. I never seen that cab around here before." (Id. 4–5.) Anderson reported that the cab turned south on Seventh Street, traveling towards Maclay Street. (Id. 4.)

While Anderson was on the phone with the 911 operator, her report was simultaneously relayed to a Harrisburg police dispatcher who, in turn, communicated the information to police officers stationed in the area near Seventh and Radnor. The dispatcher relayed to the officers the description of the taxicab, that it had two occupants, and that it was traveling south on Seventh Street towards Maclay Street. (Dispatch Tr. 1.) The dispatcher also informed the responding officers that the call was a "signal 50," meaning "shots fired." (Hr'g Tr. 17.) The first officer to arrive at the scene at Seventh and Radnor, Officer John Doll, found a van parked in the lot, as Anderson had seen. He found no one in or near the van. (Id. 23.)

At approximately the same time, another officer, Officer Grinkowitz, radioed that a white taxicab with a green rooftop light passed him going south at the 1700 block of Seventh Street, at Harris Street approximately ten blocks south from where the gunshot was reported. (Hr'g Tr.

---

[1] At the Court's request, the Government provided audio copies and a transcript of the 911 Call and the Dispatch Tape played at the suppression hearing. The transcripts were likewise provided to Johnson.

23–24.) Officer Doll responded, "there is nobody here at Seventh and Radnor. So they're probably in the cab." (Dispatch Tr. 2.) He told Officer Grinkowitz to stay with the cab, but instructed him not to initiate a traffic stop. (Hr'g Tr. 24.)

Unbeknownst to the dispatchers or the police, in the cab were the Defendant, Anthony Johnson, and his eight-year old son. The driver, an acquaintance of Johnson, picked up the two as a personal favor. He intended to drive south on Seventh Street to its termination at Walnut Street and then take Aberdeen Street to the Mulberry Street Bridge. (Hr'g Tr. 53, 60.)

Officer Grinkowitz did not turn on his car's sirens or emergency lights, and the cab driver later testified that he was unaware that he was being followed. (Hr'g Tr. 49.) The cab continued traveling south on Seventh Street and turned into Aberdeen Street, which is a narrow alleyway. There, the police positioned their vehicles to block the cab from escaping. Numerous police officers[2] surrounded the cab, many with their sidearms drawn. (Id. 24–25.) They were following "general practice" to protect themselves and others, because there reportedly was a weapon involved. (Id. 39.) The officers began shouting and yelling for the occupants to get out. (Id. 24–25.)

The police then secured the vehicle. Johnson was taken out of the backseat and handcuffed. (Hr'g Tr. 25–26.) He was not placed under arrest; rather the officers intended to detain him until the cab was cleared of people. (Id. 40.) The police then ordered the driver out and also placed him in handcuffs. (Id. 26.) The last occupant removed was Johnson's son, who was placed to the side. (Id.) Once the vehicle was cleared, Officer Richard Gibney approached

---

[2] The exact number of police officers and vehicles involved in the stop is unclear. At the Suppression Hearing, Officer Doll testified that "quite a few" officers were involved, (Hr'g Tr. 33), while the cab driver said that "there was a lot of [officers]" involved (id. 50).

the cab from the rear on the driver-side. (Id. 26, 42.) The driver-side door and the passenger-side rear doors were open, and the interior dome light of the car was on. (Id. 43.) Through the driver-side rear door, which was closed, Officer Gibney noticed an unzipped duffel bag in the backseat. (Id.) He saw the butt of a gun—identified in the original and superceding indictments as a Taurus .38 Special revolver—sticking out of the bag. Two casings were spent, meaning the gun had been fired twice. (Id. 37.) Officer Gibney retrieved, unloaded, and gave the gun to Officer Doll. (Id. 26, 42.)

Officer Doll then placed Johnson under arrest for possession of the gun and suspected involvement in the shooting incident, read Johnson his Miranda rights, and began to question him about the weapon. (Hr'g Tr. 26.) Johnson did not respond to Officer Doll's questions and instead looked at the officer "dumbfoundedly." (Id. 26, 29.) Doll then searched Johnson's clothes pockets and found a small bag of marijuana, another small bag of a white, powdery substance later identified as cocaine, and a plastic straw cut in half. (Id. 27.)

Johnson was placed in a transport van and taken to the police station for booking. At the station, Johnson began to talk with Officer Doll, who had arrived at the station in a different car. (Hr'g Tr. 28.) About twenty to thirty minutes had passed since Johnson had been read his Miranda rights. (Id.) Johnson admitted that he owned the firearm but when questioned further about the shooting incident, he denied ever firing the gun. He asked the officer to go easy on him with the drug charges. (Id. 28–29.) Johnson did not sign a statement relinquishing his Miranda rights and there is no videotape of his incriminating statements. (Id. 40.)

On January 16, 2008, a grand jury indicted Johnson on one count of illegal possession of a firearm by a person with three prior felony convictions, in violation of 18 U.S.C. §§ 922(g)(1)

and 924(e), to which Johnson pleaded not guilty. The grand jury handed down a superceding indictment on May 28, 2008, reincorporating the firearm possession count and adding one count for possession with intent to distribute marijuana and cocaine, in violation of 21 U.S.C. § 841(a)(1). Johnson pleaded not guilty to the superceding indictment on June 17, 2008. The present motion to suppress was filed on April 23, 2008. The parties have fully briefed the motion (Docs. No. 30, 24), and the Court held an evidentiary hearing on May 28, 2008.

## II. DISCUSSION

Johnson moves to suppress physical and testimonial evidence taken as a result of the stop, specifically the handgun found in a duffel bag in the rear seat of the cab, the drugs and drug paraphernalia found on his person, and inculpatory statements made by him and others.[3] Johnson contends that the Harrisburg police, by stopping the cab and subsequently arresting him, violated the Fourth Amendment's prohibition against unreasonable searches and seizures. He also argues that his statements should be suppressed as the fruits of an illegal search and because they were taken in violation of his privilege against self-incrimination provided by the Fifth Amendment and Miranda v. Arizona, 384 U.S. 436 (1966) and its progeny. The Court will address each argument in turn.

### A. The Initial Seizure

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity

---

[3] In its Brief in Response, the Government indicated that Johnson's son incriminated his father (Doc. No. 30, at 2); however, at the suppression hearing, no evidence was presented of any such statements.

is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). It is well-settled that the initial traffic stop of the cab constitutes a seizure under the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979). And during a traffic stop, passengers in the car, as well as the driver, are seized. Brendelin v. California, 127 S. Ct. 2400, 2404 (2007). Police may stop a vehicle when the officer has reasonable and articulable suspicion that either the vehicle or an occupant is in violation of the law. E.g., United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (quoting Prouse, 440 U.S. at 663).[4] Traffic stops, as a subset of investigative detentions, are governed by the Fourth Amendment's reasonableness standard—an objective standard that balances the intrusion upon the individual's Fourth Amendment interests against the legitimate goals of law enforcement. Prouse, 440 U.S. at 654.

Johnson argues that the Harrisburg police had neither probable cause nor reasonable suspicion to stop the taxicab in which he was riding. The Government responds that the officers' stop of the cab was an investigatory detention—not an arrest—and that it was supported by their reasonable suspicion that an occupant of the cab was involved in the "shots fired" incident. Because (as explained below) the Court finds that the stop of the cab was an investigative detention, the Court must determine (1) whether the police had reasonable suspicion to initiate the investigative detention, and (2) if so, whether, in blocking the cab in an alleyway, ordering the occupants out at gunpoint, and handcuffing them, the police exceeded the permissible scope

---

[4] In light of language from Whren v. United States, 517 U.S. 806 (1996), there has been some confusion regarding whether probable cause or reasonable suspicion is needed to effect a traffic stop. Compare id. at 810 (dictum) (decision to stop automobile is reasonable when police have probable cause) with Prouse, 440 U.S. at 663 (holding) (traffic stops require "at least" reasonable suspicion). The Third Circuit dispelled any such confusion in United States v. Delfin-Colina, 464 F.3d 392 (3d Cir. 2006), when it held that reasonable suspicion—and not probable cause—is required for a "routine" traffic stop, id. at 397. As the traffic stop at issue here was not "routine," the reasonableness of its scope is more fully addressed infra.

of the investigative detention permitted by their reasonable suspicion.

### 1. *Reasonable Suspicion and the Initial Stop*

The first question the Court must answer is whether the police had a reasonable, articulable suspicion sufficient to detain the cab and its occupants. Reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence; however, it nonetheless requires an officer to articulate "an objective justification for making the stop." Wardlow, 528 U.S. at 123 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). Based on the totality of the circumstances, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. United States v. Cortez, 449 U.S. 411, 417–18 (1981).

Normally, reasonable suspicion to stop a vehicle and detain its occupants flows from a police officer's contemporaneous observation of a violation of motor vehicle laws. See, e.g., United States v. Booker, 237 F. App'x 782 (3d Cir. 2007) (failing to use turn signal); United States v. Fleetwood, 235 F. App'x 892 (3d Cir. 2007) (snow obstructing license plate); United States v. Delfin-Colina, 464 F.3d 392 (3d Cir. 2006); (object obstructing windshield); United States v. Reid, 185 F. App'x 208 (3d Cir. 2006) (running red light); United States v. Davenport, 134 F. App'x 523 (3d Cir. 2005) (speeding). But firsthand observations and a motor vehicle infraction are merely sufficient, and not necessary, prerequisites for a traffic stop. Police may stop and detain a vehicle and its occupants based on reasonable suspicion prompted by secondhand information, and based on a violation of any law. See, e.g., United States v. Goodrich, 450 F.3d 552 (3d Cir. 2006) (car stopped based on tip that occupants had committed a robbery); United States v. Torres, No. 07–1669, — F.3d —, 2008 WL 2813035 (3d Cir. Jul. 23,

2008) (car stopped based on a 911 call reporting that the driver had brandished a handgun in public).  In this case, the parties agree that there was no underlying motor vehicle infraction, so the officers' justification for stopping the taxicab hinges on the alleged connection between the vehicle and the incident described by Tammy Anderson to the 911 operator.

Contrary to Johnson's position, the connection between the 911 call and the taxicab was sufficiently developed as to justify stopping the taxicab.  The Harrisburg police officers had several pieces of information that, in total, amount to reasonable suspicion.  First, Ms. Anderson was a concerned citizen calling to report an unfolding incident involving a gunshot and fighting—events to which she was an eyewitness.  Reasonable cause to perform an investigative detention may be based on second-hand information.  Adams v. Williams, 407 U.S. 143, 147 (1972).  Second, the 911 operator and the police dispatcher were in a position to judge Ms. Anderson's demeanor and credibility.  At the suppression hearing, the 911 operator testified that she was "very aware" of the area from which Ms. Anderson was calling.  (Hr'g Tr. 10–11.)  Third, the 911 operator and the police knew that Ms. Anderson was contemporaneously reporting her observations—evinced by the fact that she told the operator that a police car had mistakenly driven past the scene.  (911 Call Tr. 4.)  Greater weight can be given to an eyewitness' recent observations, United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000) (citing Adams, 407 U.S. at 147), and here there was no delay between Ms. Anderson's observations and her report.  Ms. Anderson heard a gunshot coming from an area, saw the people wrestling, and immediately called police.  Despite the rain and darkness, she was able to see a white taxicab with a distinctive green light leave the scene, heading south on Seventh Street.  Ms. Anderson was adamant that she had never before seen a similar cab.  Within ten blocks of

her location, and while Ms. Anderson was still on the phone, a police officer observed a taxicab with a green rooftop light traveling south on Seventh Street, corroborating her report. Under these circumstances, it was reasonable for police to believe that an occupant of the car was connected to the shooting incident, and the officers acted reasonably in stopping it to investigate.

Johnson's reliance on Florida v. J.L., 529 U.S. 266 (2000), is misplaced because unlike in J.L., the tip received by Harrisburg police was not anonymous. In J.L., the Supreme Court held that an anonymous tip lacking sufficient indicia of reliability cannot give rise to reasonable suspicion. Id. at 274. By its language, J.L. applies only to anonymous tips. The Court noted that the reliability of anonymous tipsters cannot be assessed, which means they cannot be held responsible for reporting false information. Id. at 270. Those concerns are not present here. In contrast to J.L., the Harrisburg Police Department was aware of Ms. Anderson's identity and that she was an eyewitness.[5]

Johnson's comparison of his situation to that in United States v. Jaquez, 421 F.3d 338 (5th Cir. 2005) (per curiam), is likewise unpersuasive. Jacquez a factually distinguishable case decided by the Fifth Circuit Court of Appeals. The police in Jaquez stopped a car pursuant to a

---

[5] Insofar as Defendant suggested the 911 operator or other police officers should have performed a more extensive background check to confirm that Ms. Anderson was, in fact, who she represented herself to be, the Third Circuit has explained:

> [W]e do not fault the officers' choice to forego extensive credibility checking in order to quickly respond. The business of policemen and firemen is to *act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.

United States v. Torres, No. 07-1669, — F.3d —, 2008 WL 2813035, at * 5 (3d Cir. July 23, 2008) (quoting United States v. Sanchez, 519 F.3d 1208, 1211 n.1 (10th Cir. 2008)) (emphasis in original).

report of "shots fired"; however, the only description given was the car's color—red. The officers lacked any other information, such as the car's make, model, or number of occupants. Id. at 340–41. Furthermore, fifteen minutes passed between the report and the traffic stop. Id. It was under these circumstances that the Fifth Circuit held that the officer lacked reasonable suspicion to stop the car. Id. at 340.

Moreover, there are cases within this circuit addressing analogous situations that support the proposition that the officers here had reasonable suspicion to stop the taxi. In United States v. Nelson, 284 F.3d 472 (3d Cir. 2002), the Third Circuit rejected a defendant's challenge to a search and held that an anonymous tip that drug dealers were driving a gray BMW with temporary license plates on a certain road amounted to reasonable suspicion. Id. at 481. Similarly, in United States v. Harpel, 202 F.3d 194 (3d Cir. 1999), the court denied suppression of evidence found in a search of a car that "substantially matched the description" given by the police officers' supervisor, including the color of the vehicle, suspected number of occupants, and the presence of a third, rear-window brake light. Id. at 196-97. Finally, in a recent case, the Third Circuit held that an investigative detention was reasonable when it was based on an anonymous, but specific and contemporaneous account giving the car's make, model, color, and license plate number; the race of the driver; and that the caller had just witnessed the driver brandishing a gun in public. United States v. Torres, No. 07-1669, — F.3d —, 2008 WL 2813035, at *1 (3d Cir. July 23, 2008).

The above-mentioned trio of Third Circuit cases provide greater guidance in this situation than does Jacquez. Ms. Anderson gave a specific description of a distinct vehicle. She provided not only the color of the cab but also described its most distinctive feature—the green light.

Second, Anderson gave her account to the 911 operator "in play-by-play fashion." United States v. Torres, at *4.  Finally, Ms. Anderson's information was corroborated in a shorter span of time—police arrived at the scene of the shooting incident and began to follow the car while she was still on the phone.[6]

The Court finds that the initial stop was based on reasonable suspicion derived from Ms. Anderson's report and the police officers' subsequent corroboration.  Thus, it was constitutional.

### 2.     *The Scope of the Investigative Detention*

Next, the Court must determine whether the Harrisburg police officers exceeded the scope of an investigative detention by their show of force.  The extent and duration of an investigative detention "will vary to some extent with the particular facts and circumstances of each case and . . . the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion).  "In determining whether an investigatory stop is legal, the court . . . examines its relative intrusiveness." United States v. Goodrich, 450 F.3d 552, 558 (3d Cir. 2006) (internal citation omitted). "To justify a greater intrusion . . . the totality of the circumstances known to the police officer must establish reasonable suspicion or probable cause to support the intrusion." United States v. Johnson, 63 F.3d 242, 247 (3d Cir. 1995).

Johnson rightly points out that the investigative detention of the taxicab in which he was a passenger was not a "routine" traffic stop.  Harrisburg police blocked the cab from exiting the narrow alleyway, ordered the occupants to exit at gunpoint, and placed the driver and Johnson in

---

[6] The 911 call lasted about eight minutes.  (911 Call Tr. 1.)

handcuffs. This show of force is certainly greater than that which a driver should expect when stopped for the "run of the mill" traffic violation, but the circumstances surrounding the stop were not "run of the mill." The police were reacting not to a motor vehicle code infraction, but rather to a report that an individual inside the cab might be armed and involved in a shots fired incident that had occurred moments earlier. At the suppression hearing, Officer Doll indicated that the responding officers had their weapons drawn to secure the vehicle and its occupants for safety reasons. (Hr'g Tr. 25.)

The line between a proper investigative detention and a *de facto*, illegal arrest can be illusive and tenuous. Each is a restraint on a person's freedom of movement because neither the detainee nor the arrestee is "at liberty to ignore the police presence and go about his business." Knaupp v. Texas, 538 U.S. 626, 629 (2003) (per curiam) (internal quotation omitted). The Court evaluates the use of force and other factors surrounding an investigative detention for reasonableness, "balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." Baker v. Monroe Twp., 50 F.3d 1186,1192 (3d Cir. 1995) (citing United States v. Sharpe, 470 U.S. 675, 682–83 (1985)). "Reasonableness must be judged based on the particular circumstances of the case." Id. at 1202 (Alito, J., concurring in part, dissenting in part) (citations omitted). An investigative detention can become unreasonable, and thus unconstitutional if for excessive force is used. E.g., id. at 1192–93. (majority opinion).

An investigative detention is not automatically transformed into a full-blown arrest when officers block a car or draw their weapons. As the Third Circuit has acknowledged, "[t]he vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching

with weapons ready, and even drawn, does not constitute an arrest per se." United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995) (citing cases).[7]  Similarly, handcuffing or forcefully restraining a suspect during an investigative detention might be reasonable given the circumstances.  Baker, 50 F.3d at 1193; see also Muehler v. Mena, 544 U.S. 93 (2005) (handcuffing while executing a search warrant may be reasonable under some circumstances); Torres v. United States, 200 F.3d 179, 186 (3d Cir. 1999) (same).

    Neither the show of force by the police nor Johnson's handcuffing *before* he was arrested made the investigative detention unreasonable and, thus, unconstitutional.  The circumstances show that the officers were responding to an incident involving firearms.  They believed that an occupant of the cab might be armed and involved in a shots fired incident.  Prompted by legitimate safety concerns for themselves and bystanders, they blocked the cab, drew their weapons, and restrained the occupants.  The Court finds that the police did not exceed the permissible scope of an investigative detention; therefore, the initial stop was reasonable under the Fourth Amendment.

**B.**     **The Subsequent Search of the Taxi Cab and Defendant's Arrest**

As the initial detention of the cab and its occupants was constitutional, the Court must decide whether the police legally found the gun that led to Johnson's arrest, which subsequently led to the discovery of the marijuana and cocaine.  Johnson argues that no exception to the Fourth Amendment's warrant requirement applies.  The Court disagrees.

---

[7] At the suppression hearing, Johnson argued that the police should have done something less than order the occupants out of the cab at gunpoint, such as by requesting the driver to approach and discuss the situation with them.  But the line between an investigative detention and an arrest does not turn on whether there were *lesser* intrusive means available to effectuate the seizure, but rather on whether the means used were the least intrusive *reasonably available*. See Royer, 460 U.S. at 500 (plurality opinion).

### *1.   The Discovery of the Gun*

After the police initiated the stop of the cab and detention of its occupants, Officer Gibney saw the firearm protruding from a bag located on the backseat of the car, and he retrieved and secured it. After Officer Doll learned of the discovery of the gun, he placed Johnson under arrest.

"Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (citing Katz v. United States, 389 U.S. 347, 356–57 (1967) (plurality opinion)). "Plain view" is a well-recognized exception to the warrant requirement. See Horton v. California, 496 U.S. 128 (1990). For the plain view exception to apply, the following three elements must be met. First, police must not have violated the Fourth Amendment in "arriving at the place from which the evidence can be viewed." Id. at 136. Second, it must be immediately apparent that the evidence is incriminating. Id. at 137. Third, the police must have a lawful right of access to the object itself. Id.

Applying this framework to the facts, The Court finds that the plain view exception applies to Officer Gibney's discovery of the gun. First, as discussed above, the stop of the vehicle and removal of the occupants was lawful.[8] Second, the police had reasonable suspicion that an occupant of the taxi was involved in a shots fired incident and believed that the gun was incriminating evidence. Third, the police were able to lawfully access the gun. Police conducting an investigative stop of a vehicle may, consistent with the Fourth Amendment,

---

[8] Johnson focuses his attack on the first element of the plain view exception—that the police had no probable cause to arrest him. This argument is rendered moot by the Court's above finding that the initial stop was constitutional.

14

perform a protective search of the passenger compartment of the car, "limited to those areas in which a weapon may be placed or hidden." Michigan v. Long, 463 U.S. 1032, 1035 (1983).

In this case, the evidence shows that Johnson had just exited the backseat of the taxicab, thus it was under his "immediate control." Id. Because the Harrisburg police officers were lawfully performing an investigative detention, the firearm was immediately apparent as incriminating evidence, and it was legally accessible by Officer Gibney, the plain view exception applies.[9] The seizure of the firearm was constitutional and it is admissible under the plain view exception.[10]

### 2. *The Discovery of the Drugs and Drug Paraphernalia*

Having concluded that the initial stop was constitutionally sound, the Court must now separately consider the legality of Johnson's arrest. The police needed probable cause to place Johnson under arrest and the discovery of controlled substances on his person. "Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony." United States v.

---

[9] The Government argues that the "the police officers had authority to seize all of the materials . . . in the back of the taxicab," as a search incident to arrest. (Gov't Br. in Resp. 10.) Insofar as that argument applies to the firearm, it is incorrect. Probable cause to arrest Johnson emanated from the discovery of the revolver. A search incident to arrest may be performed before the arrest, but it cannot be used to *create* probable cause: "*Once* an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to . . . search[] the entire passenger compartment." Thornton v. United States, 541 U.S. 615, 623 (2004) (emphasis added); see also Rawlings v. Kentucky, 448 U.S. 98, 111 n.6 (1980) (plurality opinion) ("The fruits of the search of petitioner's person [prior to his arrest] were, of course, not necessary to support probable cause to arrest petitioner."). The gun can only be admissible as evidence discovered in plain view, or as part of a protective sweep of the vehicle.

[10] Even if the plain view exception were not applicable—that is, had police not seen the gun through the window—it would be admissible as evidence discovered during a protective sweep of the passenger compartment of the taxicab. See Long, 463 U.S. at 1035.

15

McGlory, 968 F.2d 309, 342 (3d Cir. 1992) (citing United States v. Watson, 423 U.S. 411, 421 (1976) (plurality opinion)).  "Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense had been committed." Id. (internal citation omitted).

At the time of the arrest, Johnson had been traveling in a vehicle that an eyewitness connected to a shots fired incident.  Police officers discovered a revolver in a bag located on the seat of the cab next to where Johnson had been sitting.  Spent shells suggested that the gun had twice been recently discharged.  Johnson was arrested for unlawful possession of a firearm—a felony under Pennsylvania law, see 18 Pa. Cons. Stat. § 6106—and for suspected involvement in the shooting incident.

Under the totality of the circumstances, the arresting officers reasonably believed there was probable cause to arrest Johnson for his suspected involvement in the shots fired incident and for unlicensed possession of a firearm.

As the arrest was supported by probable cause, Officer Doll could properly search any area within Johnson's immediate control, including his person and the entire passenger compartment of the taxicab.  Thornton v. United States, 541 U.S. 615, 621 (2004); New York v. Belton 453 U.S. 454, 462 (1981); Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Myers, 308 F.3d 251, 267 (3d Cir. 2002) (internal citations omitted).  Johnson has no basis to challenge the discovery of the marijuana, cocaine, and the plastic straw found on his person, or any other evidence found in the taxicab's passenger compartment.  These items were obtained as part of a valid search incident to arrest.

**C.    Johnson's Incriminating Statements to Police**

Finally, Johnson argues his statements to Officer Doll made at the police station were taking in violation of his Miranda rights.[11]  A suspect is entitled to an admonition of his constitutional rights to remain silent and to retain an attorney if the suspect is under custodial interrogation.  No one disputes that Johnson was entitled to be informed of his Miranda rights—he was in custody, Berkemer v. McCarty, 468 U.S. 420, 428 (1984), and under interrogation, Rhode Island v. Innis, 446 U.S. 291, 300-1 (1980) (plurality opinion).  Officer Doll read Johnson his Miranda rights at the scene of the arrest.  The parties disagree whether Johnson waived his rights when, twenty to thirty minutes later, he admitted to owning the gun.

A suspect may waive his Miranda rights only if he does so voluntarily and knowingly. North Carolina v. Butler, 441 U.S. 369, 373 (1979).  The Government bears the burden of establishing a knowing and voluntary waiver by the preponderance of the evidence.  United States v. Matlock, 415 U.S. 164, 178 n.14 (1974); United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).

Johnson argues broadly that his statements are inadmissible because they were not knowing and voluntary.  The Government can meet its burden of showing that Johnson's statements were not coerced by showing that Johnson's actions imply that he waived his rights. The Government need not show an express waiver of Johnson's Miranda rights.  Butler, 441 U.S. at 373 ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."). However, for a waiver to be valid, the Court must

---

[11] Johnson argues that his statements and statements made by others should be suppressed as fruits of an illegal detention, search, or arrest.  See Wong Sung v. United States, 371 U.S. 471 (1963).  Since the search and arrest were legal, the Court will only consider his arguments as they pertain to the Fifth Amendment and Miranda and its progeny.

be satisfied that the totality of the circumstances shows that (1) the waiver was voluntary, meaning that it was an uncoerced free choice; and, (2) the waiver was knowing in the sense that the defendant is aware of his rights and the consequences of waiver. E.g., Fahy v. Horn, 516 F.3d 169, 194 (3d Cir. 2008) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  Only when these two factors are met will a waiver of Miranda rights be upheld.

Applying this two-part test, first, the Court finds that Defendant's statement was voluntary.  The only force used in effecting Johnson's arrest and gathering evidence occurred at the scene of the traffic stop, where, with guns drawn, officers ordered him out of the cab and handcuffed him.  The show of force was a safety measure that lasted until the cab and its occupants were secured; it was not done to coerce Johnson into confessing to a crime.  There is no evidence of force, threat of force, or deception with regard to Johnson's statements to police made twenty to thirty minutes later during the booking process.  Indeed, the Government proffered evidence that it was Johnson who initiated contact with the police at the station, and there is no evidence to the contrary.  (Hr'g Tr. 28.)

Second, the record demonstrates that Johnson was aware of his Miranda rights and of the consequences of waiver.  There is no indication or allegation that Johnson was unable to understand his rights due to mental or physical incapacity, inability to comprehend English, or the effects of drugs or alcohol.  Upon receiving his Miranda warning at the scene, Johnson did not answer Officer Doll's questions about the gun, but twenty to thirty minutes later, Johnson voluntarily initiated communications with the officer.

In conclusion, there is no dispute that Johnson was entitled to a Miranda warning or that he received one.  The preponderance of the evidence shows that he knowingly and voluntarily

waived his rights when he initiated communication with Officer Doll. Accordingly, Johnson's statements implicating himself will not be suppressed.[12]

### III.     CONCLUSION

For the foregoing reasons, the Court will deny Defendant's motion to suppress the physical and testimonial evidence obtained as a result of the traffic stop of the taxicab and Defendant's subsequent arrest.

An appropriate order follows.

---

[12] As far as Johnson seeks to suppress statements made by others, see supra, n.3 & n.11, there is no legal basis for suppressing those statements because, as explained above, the traffic stop was constitutional.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | **Criminal No. 08-CR-18** |
| **v.** : | |
| : | **(Chief Judge Kane)** |
| **ANTHONY JOHNSON,** : | |
| : | |
| **Defendant** : | |

## ORDER

And now, on this 17th day of September, 2008, upon consideration of Defendant's motion to suppress (Doc. No. 23), and for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED** that the motion (Doc. No. 23) is **DENIED**.

    S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania